*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0364P (6th Cir.)
File Name: 03a0364p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

JOHN HANCOCK FINANCIAL
SERVICES, INC.,
    *Plaintiff-Appellee/*
    *Cross-Appellant,*

    *v.*

OLD KENT BANK,
    *Defendant-Appellant/*
    *Cross-Appellee,*

MICHIGAN NATIONAL BANK;
PATRICK W. SHERMAN;
STANDARD FEDERAL BANK,
successor by merger to
Michigan National Bank,
    *Defendants.*

Nos. 02-1288/1307

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 00-73879—Avern Cohn, Senior District Judge.

Argued: September 12, 2003

Decided and Filed: October 10, 2003

---

Before: MERRITT, MOORE, and GILMAN, Circuit
Judges.

_____

### COUNSEL

**ARGUED:** Molly E. McManus, WARNER, NORCROSS &
JUDD, Grand Rapids, Michigan, for Appellant. Francis R.
Ortiz, DICKINSON WRIGHT, PLLC, Detroit, Michigan, for
Appellee. **ON BRIEF:** Molly E. McManus, Nathaniel R.
Wolf, WARNER, NORCROSS & JUDD, Grand Rapids,
Michigan, for Appellant. Francis R. Ortiz, DICKINSON
WRIGHT, PLLC, Detroit, Michigan, for Appellee.

_____

### OPINION

_____

RONALD LEE GILMAN, Circuit Judge. John Hancock
Financial Services, Inc., a Delaware corporation, sued Old
Kent Bank, a Michigan corporation, to recover check
proceeds converted by Old Kent and paid to one of John
Hancock's agents, Patrick Sherman. The checks were drawn
on the accounts of several clients of John Hancock, were
made payable to John Hancock, and were entrusted to
Sherman to invest. Sherman instead indorsed the checks with
his own stamp and deposited them into his personal business
account with Old Kent. Over the course of seven years,
Sherman used this scheme to embezzle nearly $800,000 from
John Hancock and its clients.

The claims against Old Kent were based on common law
conversion, statutory conversion under the Uniform
Commercial Code (UCC), and negligence. John Hancock
filed a motion for summary judgment. Old Kent both
responded to John Hancock's motion and filed its own motion

for partial summary judgment, arguing that the three-year statute of limitations had run on all checks deposited prior to June 2, 1997.

The district court ruled in favor of John Hancock on the basis of its UCC conversion claim, but also granted Old Kent's motion for partial summary judgment. On appeal, Old Kent argues that the district court erroneously decided that the bank's forgery defense was without merit and that the district court failed to address the bank's contention that the Michigan Tort Reform Act's comparative-fault scheme applied to UCC conversion claims. John Hancock disagrees, and also argues that the discovery rule should be applied so that it can recover on all checks unlawfully converted by Old Kent, some dating back to 1993. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A. Factual background

Sherman was a representative of John Hancock in Michigan, where he sold insurance and investment products. Beginning in 1993, he concocted a scheme to embezzle from three of his John Hancock clients. The clients would write checks payable to John Hancock for investment products or insurance premiums. Sherman was authorized to accept these checks on behalf of John Hancock. He would then indorse the checks with a stamp that read: "Sherman and Associates Financial Services." Sherman maintained a checking account at an Owosso, Michigan branch of Old Kent under the same name as that on his indorsement stamp. Old Kent deposited these checks into Sherman's account, never questioning his authority to deal in this manner with checks clearly made payable to John Hancock. Approximately 71 checks were so indorsed and deposited over a period of seven years. Sherman was able to cover up his embezzlements by

generating false accounting statements for his defrauded clients.

The scheme was finally uncovered in March of 2000, by which time Sherman had embezzled nearly $800,000. John Hancock repaid the defrauded clients the money that they had lost plus interest. It then demanded reimbursement from Old Kent.

### B. Procedural background

John Hancock sued Old Kent in August of 2000, claiming common law conversion, statutory conversion under the UCC, and negligence. The parties had earlier agreed to toll the applicable three-year statute of limitations as of June 2, 2000. Old Kent did not dispute John Hancock's factual allegations or that the bank was partially at fault, but argued that John Hancock should bear a portion of the loss. John Hancock filed a motion for summary judgment in the fall of 2001. At the same time, Old Kent filed a motion for partial summary judgment based upon the theory that the statute of limitations barred recovery on all checks deposited more than three years prior to the June 2, 2000 tolling agreement.

The district court granted John Hancock's motion for summary judgment on the UCC conversion claims, declining to reach the claims of common law conversion or negligence. It also granted Old Kent's motion, thus limiting John Hancock's award to checks accepted for deposit by the bank after June 2, 1997, plus prejudgment interest. This timely appeal followed.

## II. ANALYSIS

### A. John Hancock's conversion claim

On appeal, Old Kent argues that the district court erred in granting summary judgment to John Hancock because

comparative-fault principles allegedly apply to John Hancock's UCC conversion claim. We review the district court's grant of summary judgment de novo. *Sperle v. Mich. Dep't of Corr.*, 297 F.3d 483, 490 (6th Cir. 2002). Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the district court must construe all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

Old Kent contends that the district court erred in not applying Mich. Comp. Laws § 440.3406 (hereafter referred to as UCC § 3-406) to John Hancock's claims. UCC § 3-406 provides in pertinent part that a party whose negligence "substantially contributes to an alteration of an instrument or to the making of a forged signature on an instrument is precluded from asserting the alteration or the forgery against a person who, in good faith, pays the instrument or takes it for value or for collection." UCC § 3-406(1). As noted above, Sherman indorsed the checks with a stamp that read "Sherman and Associates Financial Services." The district court held that the UCC's preclusion defense did not apply to John Hancock's conversion claim, reasoning that Sherman's indorsement was not a forgery because it "did not appear to be the genuine signature of the payee, John Hancock." Old Kent argues that the district court's definition of "forged signature" is too restrictive.

Because the UCC does not define the term "forged signature," Old Kent looked to Michigan law and the comments to UCC § 3-406 for the meaning of the term. Old Kent cites *Pamar Enterprises, Inc. v. Huntington Banks of*

*Michigan,* 580 N.W.2d 11, 15 (Mich. Ct. App. 1998), for the proposition that "[p]ayment of a check with a missing endorsement is the legal equivalent of payment over a forged endorsement." *Pamar*, however, gives no persuasive reason for this result, and the Michigan Supreme Court has not opined on the issue. Given the lack of a reasoned basis for treating a missing indorsement as the legal equivalent of a forged indorsement, we see no justification to extend *Pamar* to a case like the present where there is in fact an indorsement quite distinct from the named payee.

In advocating for a broad definition of the term "forged signature," Old Kent also relies on the following official comment to UCC § 3-406:

> An insurance company draws a check to the order of Sarah Smith in payment of a claim for a policy holder, Sarah Smith, who lives in Alabama. The insurance company also has a policyholder with the same name who lives in Illinois. By mistake, the insurance company mails the check to the Illinois Sarah Smith who indorses the check and obtains payment. Because the payee of the check is the Alabama Sarah Smith, the indorsement by the Illinois Sarah Smith is a forged indorsement.

UCC § 3-406 cmt. 3. Old Kent argues that Sherman's indorsements are analogous to those of Illinois Sarah Smith's because they are both indorsements "by someone other than the intended payee." In rejecting this argument, the district court noted that, unlike the hypothetical in Comment 3, Sherman's indorsement was completely different from the payee's. The district court reasoned that the use of a common name in Comment 3 "supports the argument that a forged signature must appear to be the genuine signature of the intended payee." This analysis is consistent with Comment 2 to UCC § 3-406, which suggests that the drafters intended the term "forged signature" to be construed narrowly. Comment 2 provides:

Section 3-406 refers to "forged signature" rather than "unauthorized signature" that appeared in the former Section 3-406 because it more accurately describes the scope of the provision. Unauthorized signature is a broader concept that includes not only forgery but also the signature of an agent which does not bind the principal under the law of agency. The agency cases are resolved independently under agency law. Section 3-406 is not necessary in those cases.

UCC § 3-406 cmt. 2.

The district court defined the term "forged signature" within the context of UCC § 3-406 as a signature "substantially similar to the name of the intended signator such that it appears genuine." This definition is consistent with both the common usage of the term "forged" and Comments 2 and 3 above. *See also* UCC § 3-405 (defining "fraudulent endorsement" as, "in the case of an instrument payable to the employer, a forged endorsement purporting to be that of the employer . . . ."). In sum, we agree with the district court's conclusion that Sherman's indorsements were not "forged signatures." The district court therefore properly declined to apply UCC § 3-406's preclusion defense to John Hancock's conversion claim against Old Kent.

As an alternative defense, Old Kent argues that the comparative-fault principles of the Michigan Tort Reform Act, Mich. Comp. Laws § 600.2957(1), were meant to be applied to all claims for conversion, both statutory and common law. No Michigan cases address this question, nor is there any law in the Sixth Circuit that deals with the applicability of a tort-reform scheme to UCC claims. The district court did not reach this issue, and Old Kent cites no relevant authority to support its argument.

In assessing the merits of Old Kent's alternative defense, we first look to how UCC § 3-406 allocates fault in the case

of forged instruments. Subsection 2 of UCC § 3-406 provides as follows:

(2) Under subsection (1), if the person asserting the preclusion fails to exercise ordinary care in paying or taking the instrument and that failure substantially contributes to loss, the loss is allocated between the person precluded and the person asserting the preclusion according to the extent to which the failure of each to exercise ordinary care contributed to the loss.

A reading of the UCC suggests that if the above subsection is triggered, the trier of fact allocates fault between the party whose negligence substantially contributed to the forgery of an instrument and the party who paid the instrument. The UCC's plain language does not direct the trier of fact to allocate fault to the wrongdoer.

Scholarly commentary discussing UCC § 3-406 confirms this interpretation. Comparative negligence was incorporated into the UCC as part of the 1990 amendments to Articles 3 and 4. JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 19-1 (4th ed. 1995). In drafting the revised Article 3, the authors "attempted to provide an 'underlying policy and rationale . . . based on the balanced principles that all parties in the payment and collection process have a responsibility to exercise ordinary care and that the failure by any party to fulfill that responsibility should result in that party bearing an appropriate share of any [resulting] loss.'" Judy C. Norris, *Tips on Litigating Issues of Forgery, Fraud, and Conversation* [sic] *in a Comparative Negligence Setting*, 51 Consumer Fin. L.Q. Rep. 247, 247 (1997).

One legal scholar has explained that UCC § 3-406 seeks to encourage "the free circulation of commercial paper by applying the principle that as between *two innocent persons* the one who is negligent should bear the loss caused by a

third person's wrongdoing." RONALD A. ANDERSON, ANDERSON ON THE COMMERCIAL CODE § 3-406:4 (3d ed. 1998) (emphasis added). Another commentator has similarly noted that § 3-406(b) "contemplates a splitting of a loss between *two negligent parties*." JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 19-3 (4th ed. 1995) (emphasis added).

The fact that UCC § 3-406 does not allocate fault to the wrongdoer—as opposed to the negligent parties—is significant in determining whether Michigan's Tort Reform Act applies in this case. This latter Act, passed in 1995, provides that in actions "based on tort or another legal theory seeking damages for personal injury, property damage, or wrongful death, the liability of each person shall be allocated under this section by the trier of fact, and . . . in direct proportion to the person's percentage of fault." Mich. Comp. Laws Ann. § 600.2957(1). The Act also provides that when considering percentages of fault, the trier of fact shall assess "the fault of each person, regardless of whether the person is, or could have been, named as a party to the action." *Id.* Unlike the UCC, the Tort Reform Act allocates fault to the wrongdoer in actions "based on tort or another legal theory seeking damages for personal injury, property damage, or wrongful death." *Id.* Tension thus exists between these statutes.

We conclude that this tension must be resolved in favor of *not* applying Michigan's Tort Reform Act to UCC conversion actions. Because the UCC more specifically relates to the allocation of fault with respect to the conversion of instruments than does the Tort Reform Act, the UCC controls. *See Hill v. Sacka*, 666 N.W.2d 282, 291 (Mich. Ct. App. 2003) (noting that when statutes conflict concerning the allocation of fault, the statute "more specific to the subject matter than the general statutes regarding allocation of fault . . . controls.").

We also note that our decision accords with that of the Eleventh Circuit in *Federal Insurance Company v. NCNB National Bank of N.C.*, 958 F.2d 1544, 1551-52 (11th Cir. 1992), where the Eleventh Circuit discussed the possibility of applying comparative-fault principles to UCC conversion claims, but then declined to do so. The court quoted the New York Court of Appeals at length, including the point that "[i]t is not for the courts to unsettle the UCC's carefully drawn balance by introducing comparative fault principles taken from tort law." *Putnam Rolling Ladder Co. v. Manufacturers Hanover Trust Co.*, 546 N.E.2d 904, 908 (N.Y. 1989). We agree with this analysis.

The district court declined to reach John Hancock's common law conversion claim altogether, holding that its holding on the UCC claim made such consideration unnecessary. As Old Kent points out, however, there is recent case law in Michigan that applies comparative-fault principles to intentional torts. *See Lamp v. Reynolds*, 645 N.W.2d 311, 315-16 (Mich. Ct. App. 2002) (applying comparative-fault principles where the motocross racetrack owners' wilful and wanton conduct in failing to remove a tree stump from the edge of their racetrack caused a motocross racer's injuries). But Old Kent makes no claim that John Hancock committed an intentional tort, and *Lamp* provides no support for Old Kent's argument that comparative fault should apply to a statutory conversion claim based upon a lack of due care. We therefore reject Old Kent's comparative-fault defense, and affirm the grant of summary judgment to John Hancock on its statutory conversion claim.

## B.   Old Kent's statute of limitations defense

John Hancock, in its cross-appeal, argues that the district court erred in granting Old Kent's motion for partial summary judgment, which barred John Hancock's recovery on all checks deposited more than three years before the June 2,

2000 tolling agreement. This reduced John Hancock's recovery from approximately $800,000 to about $444,000.

Application of the "discovery rule" would have deferred the commencement of the three-year statute of limitations until John Hancock actually discovered the conversion, or until it should have discovered the conversion through the exercise of reasonable diligence, whichever first occurred. *See Blakely v. U.S.*, 276 F.3d 853, 861, 869-70 (6th Cir. 2002) (noting that the discovery rule could apply to Blakely's claim for fraud against the Oxford Bank for allegedly facilitating the wrongful taking of Blakely's assets by the government in a civil-forfeiture action, but holding that Blakely's claim failed for other reasons).

John Hancock asserts that because it did not discover the conversion until April of 2000, the district court should have applied the discovery rule to allow it to pursue its claims for all 71 checks converted by Old Kent. In holding that the discovery rule should not apply in this case, the district court reasoned that "there is strong public policy favoring finality on a conversion claim on a negotiable instrument." We agree.

Because jurisdiction in this case is based upon diversity of citizenship between John Hancock and Old Kent, "we apply state law in accordance with the then controlling decision of the highest state court." *Bailey Farms, Inc. v. NOR-AM Chemical Co.*, 27 F.3d 188, 191 (6th Cir. 1994). Where the state supreme court has not yet addressed the issue presented, we must anticipate how that court would rule. *Id.* Although the Michigan Supreme Court has not decided the issue of whether the discovery rule applies to UCC conversion claims, the Michigan Court of Appeals addressed this issue in *Brennan v. Edward D. Jones & Co.*, 626 N.W.2d 917, 919 (Mich. Ct. App. 2001), where the court noted that statutes of limitations are designed to "promote judicial economy and protect defendants' rights." The discovery rule has been applied "to prevent unjust results when a plaintiff would

otherwise be denied a reasonable opportunity to bring suit due to the latent nature of the injury or the inability to discover the causal connection between the injury and the defendant's action." *Id.* (internal quotation marks omitted).

In *Brennan*, the court held that the discovery rule was inapplicable to a claim for conversion. *Id.* at 920. The court reasoned that "strong public policies favoring finality in commercial transactions, protecting a defendant from stale claims, and requiring a plaintiff to diligently pursue his claim outweigh the prejudice to plaintiffs and militate against applying the discovery rule in the context of commercial conversion cases." *Id.* at 920.

Like the *Brennan* court, the Third Circuit has rejected application of the discovery rule in UCC conversion cases:

> Although a few courts apply the discovery rule to negotiable instrument theft on essentially equitable grounds, the tide of case law runs strongly against this approach. Where a party not engaging in fraudulent concealment asserts the statute of limitations defense, most courts have refused to apply the discovery rule to negotiable instruments, finding it inimical to UCC policies of finality and negotiability.

*Menichini v. Grant*, 995 F.2d 1224, 1229-30 (3d Cir. 1993).

We find the reasoning of the Michigan Court of Appeals and the Third Circuit convincing, and anticipate that the Michigan Supreme Court would agree. Accordingly, we affirm the district court's grant of Old Kent's motion for summary judgment, barring John Hancock from collecting on checks deposited more than three years before June 2, 2000.

### III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.